IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

Charlie Grigg,

Plaintiff,

v.

Union Pacific Railroad Co.,

Defendant.

Case No. _____

**CLASS ACTION COMPLAINT AND
DEMAND FOR A JURY TRIAL**

Plaintiff Charlie Grigg states and alleges as follows:

## INTRODUCTION

1.      This case concerns a railroad's hearing-exam and hearing-protection rules
that discriminate against hearing-impaired employees.

2.      Defendant Union Pacific, like all railroads, has an obligation under federal
law to require train conductors, engineers, and other similar railroad employees to undergo
periodic hearing exams. It also has an obligation to make hearing protection available to
these employees and to require the use of hearing protection in certain environments, as
defined by the Federal Railroad Administration's ("FRA's") regulations.

3.      Rather than take these requirements at face value, however, Union Pacific
has distorted them. At every turn, Union Pacific has adopted overbroad hearing-exam and
hearing-protection policies that systematically put hearing-impaired employees at a
disadvantage. Some of these policies are openly and unabashedly discriminatory. As a

prime example, Union Pacific requires employees who use hearing aids to pass a hearing exam *without their hearing aids* and *while wearing hearing protection*. But Union Pacific places this burden solely on hearing-impaired workers. Non-hearing-impaired employees are considered fit for duty if they pass the same test *without wearing* hearing protection. Hearing-impaired employees are thus required to pass a much tougher test.

4.     Union Pacific discriminates in other ways as well. It maintains an overbroad hearing-protection policy that, when enforced, systematically disadvantages hearing-impaired employees. And it refuses to provide reasonable accommodations to hearing-impaired employees. Rather than work with hearing-impaired employees to accommodate their disabilities, Union Pacific insists that such employees wear a single, company-approved device that frequently makes their hearing worse. Dooming them to fail, Union Pacific then suspends and terminates employees who cannot meet its discriminatory standards—all while falsely claiming that its own discriminatory policies are mandated by federal law.

5.     This dispute arises under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, which "was passed by large majorities in both Houses of Congress after decades of deliberation and investigation into the need for comprehensive legislation to address discrimination against persons with disabilities." *Tennessee v. Lane*, 541 U.S. 509, 516 (2004). As Congress found, "overprotective rules and policies" and "exclusionary qualification standards and criteria" unfairly discriminate against disabled Americans and deprive these individuals of "equality of opportunity, full participation, independent living,

and economic self-sufficiency." 42 U.S.C. § 12101(a)(5), (7). This case concerns precisely such unfair, discriminatory, and overprotective rules and policies.

6.      The ADA broadly prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). The phrase "discriminate against a qualified individual on the basis of disability" embraces both plain and technical meanings. At the most basic level, an employer discriminates when it takes "an adverse employment action due to [an employee's] disability." *Chalfant v. Titan Distribution, Inc.*, 475 F.3d 982, 988 (8th Cir. 2007). But the ADA also specifically defines "discriminate against a qualified individual on the basis of disability" to include: "limiting, segregating, or classifying a[n]… employee in a way that adversely affects the opportunities or status of such… employee because of the disability of such… employee"; "utilizing standards… that have the effect of discrimination on the basis of disability"; or "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities." 42 U.S.C. § 12112(b)(1), (3), (6). The ADA further defines discrimination to include "not making reasonable accommodations to the known physical… limitations of an otherwise qualified individual with a disability." *Id.* § 12112(b)(5)(A).

7.      Plaintiff Charlie Grigg's experience was emblematic of Union Pacific's discriminatory conduct. Grigg has worked for Union Pacific as a train conductor for more than nineteen years. He is hearing impaired and wears hearing aids. There is no dispute that he has the requisite skill and experience to perform his job. But Grigg's hearing impairment put him in the crosshairs of Union Pacific's discriminatory policies. He passed

his hearing test while wearing his hearing aids, which is all that is required under the governing federal regulations. But he failed the exam while wearing Union Pacific's required hearing protection device, which he was forced to wear without his hearing aids. As a result, Union Pacific refused to allow Grigg to continue working.

8.     Grigg is hardly alone in facing such discriminatory treatment. Proceedings in a parallel case, *see Mlsna v. Union Pacific R.R. Co.*, 975 F.3d 629 (7th Cir. 2020), have revealed that Union Pacific discriminates broadly against its hearing-impaired employees. Its policies are rigid and apply in the same way to all hearing-impaired train crew members: *Any* hearing-impaired employee who cannot pass his hearing exam with unaided hearing must pass the test while wearing Union Pacific's pre-selected hearing-protection device. *Any* hearing-impaired employee who fails *that* test is not permitted to continue working. By contrast, *any* non-hearing-impaired employee who passes the test with unaided hearing is permitted to continue working. Non-hearing-impaired employees are *not required* to pass a hearing test while wearing hearing protection in order to be considered fit for duty. Union Pacific employs more than 35,000 employees, including thousands of employees with hearing impairments. The scope and breadth of Union Pacific's discriminatory policies are enormous. Grigg therefore brings this case as a class action to remedy these unlawful policies.

9.     On the merits, liability is clear: Union Pacific discriminated against Grigg on the basis of disability when it removed him from service on the basis of Grigg supposedly failing Union Pacific's hearing exam. Union Pacific's hearing-exam protocol discriminates against hearing-impaired employees, including Grigg, for a whole host of reasons. The

policy openly disfavors hearing-impaired employees: only employees who wear hearing aids are required to meet the federally mandated hearing test *while wearing hearing protection*. Employees who pass the test without hearing aids are not required to pass it while wearing hearing protection. The policy also "limit[s]" and "classif[ies]" hearing-impaired employees, including Grigg, "in a way that adversely affects the opportunities or status of such… employee because of the disability of such… employee," 42 U.S.C. § 12112(b)(1), "utilize[s] standards… that have the effect of discrimination on the basis of disability," *id.* § 12112(b)(3), and "us[es] qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities," *id.* § 12112(b)(6). For these reasons, Union Pacific has violated the ADA in every instance where it has used its hearing-exam protocol to refuse to certify (or to decertify) as a conductor or engineer, to remove from service, or to terminate any employee, including Grigg, who was able to pass the FRA's hearing exam with or without hearing aids. Union Pacific's ongoing policy, pattern, and practice of discrimination continues to violate the ADA to this day.

10.     Union Pacific has also failed to accommodate Grigg's disability as well as the disabilities of similarly situated employees. Both the governing railroad regulations and the ADA require railroads to offer employees a wide range of hearing protection devices. Union Pacific has failed to do that, instead adopting a one-size-fits-all approach for all of its hearing-impaired employees. The ADA requires more to accommodate disabled workers.

11.     Grigg brings this case to put a stop to Union Pacific's discriminatory policies.

5

## PARTIES

12.     Plaintiff Charlie Grigg is an individual residing in Henrietta, Texas.

13.     Defendant Union Pacific is a railroad operating in 23 states across the western two-thirds of the United States. It is headquartered in Omaha, Nebraska. Union Pacific employs more than 35,000 people.

## JURISDICTION

14.     This Court has original jurisdiction over Grigg's ADA claims under 28 U.S.C. § 1331.

15.     Venue is proper under 28 U.S.C. § 1391 because Union Pacific is headquartered in this District and a substantial portion of the events giving rise to Plaintiff and the putative class's causes of action arose here.

## BACKGROUND

**A.     Union Pacific Employed Grigg, a Hearing-Impaired Employee, as a Train Conductor.**

16.     Grigg was employed by Union Pacific as a train conductor.

17.     Grigg suffers from moderate hearing loss.

18.     Grigg wears hearing aids.

19.     When he is wearing his hearing aids, Grigg's hearing loss is minimal and he is able to function without any hearing issues.

20.     Union Pacific hired Grigg in January 1999 to work as a conductor out of Big Springs, Texas.

21.    In September 1999, Union Pacific transferred Grigg to the Dallas/Fort-Worth area. Grigg worked as a train conductor for Union Pacific from the Dallas/Fort-Worth location for the rest of his employment with Union Pacific, from September 1999 until the summer of 2018. During approximately the last ten years of his employment with Union Pacific, Grigg worked as a thru-freight conductor.

**B.    Union Pacific's Train Crew Job Description.**

22.    Union Pacific's "generic" job description for train crew members explains that the "basic purpose" of the position is to "[e]nsure safe, on-time/on-plan train operation and movement in compliance with company and Federal rules and instructions." Exhibit 1, at 1 (Union Pacific's train crew job description).

23.    The job description lists one-and-a-half pages of "accountabilities," or tasks a train crew member must perform on the job. *Id.* at 1-2. These tasks include, for example, operating locomotive equipment through the use of remote-control devices, coupling air hoses, uncoupling cars, "preparing written documentation," "working and interacting with others," and "[m]onitoring the situation, environment, and gauges to gather information and take appropriate action." *Id.* at 1-2.

24.    The job description states that "[t]he statements in this section are essential job functions that an employee must be able to perform with or without reasonable accommodation in order to achieve the objectives of the job." *Id.* at 1-2.

25.    In a separate section several pages later, the job description states that a train crew member must "wear personal protective equipment such as… hearing protection where the company requires." *Id.* at 4.

**C.    The FRA Maintains Regulations Governing Occupational Noise Standards and Engineer and Conductor Certification.**

26.    At the direction of Congress, the Federal Railroad Administration ("FRA") comprehensively regulates matters of health and safety in the railroad industry. Two FRA regulations play a starring role in this case. The first establishes occupational noise standards for railroads, including the use of hearing protection. The second requires railroads to certify train engineers and conductors as fit for duty. That certification requirement, in turn, requires engineers and conductors to pass a hearing exam. Because the remaining facts require familiarity with these regulations, they are set forth in some detail here.

**(1)    The FRA's occupational noise standards.**

27.    The FRA has regulated locomotive noise levels since 1980. Occupational Noise Exposure for Railroad Operating Employees, 71 Fed. Reg. 63,066, 63,068 (Oct. 27, 2006) (codified at 49 C.F.R. pts. 227 and 229).

28.    The FRA's first such regulation provided that "the permissible exposure to a continuous noise in a locomotive cab shall not exceed an eight-hour time-weighted average of 90 dB(A), with a doubling rate of 5 dB(A)." 49 C.F.R. § 229.121(a) (1980). The same regulation provided that "[e]xposure to continuous noise shall not exceed 115dB(A)." *Id.* § 229.121(c) (1980).

29.    Some of these terms require further explanation. "dB(A)" means "the sound pressure level in decibels measured on the A-weighted scale." 49 C.F.R. § 227.5. For the sake of simplicity, this Complaint will use the term "decibels" to mean "dB(A)." Because

the human ear can perceive a tremendous range of sounds, decibels are measured logarithmically; every increase of 10 decibels represents a doubling of volume. *Id.* The concepts of "time-weighted average" (abbreviated as "TWA") and "doubling rate" (called the "exchange rate" under the current regulations) work in tandem: every time the doubling rate amount is added to the baseline decibels average, the allowable time exposure is cut in half. *Id.* To illustrate, under the 1980 regulation, a train conductor could permissibly be exposed to eight hours of sound averaging 90 decibels, four hours of sounds averaging 95 decibels, two hours of sound averaging 100 decibels, and so forth. 49 C.F.R. § 229.121(c) (1980); 49 C.F.R. § 227.5; 49 C.F.R. Pt. 227, App. A.

30.     The FRA revised and expanded its occupational noise standards in 2006, drawing heavily from regulations issued by the Occupational Safety and Health Administration ("OSHA"). 71 Fed. Reg. 63,066, at 63,067. Aside from minor subsequent amendments not relevant here, these revised regulations remain in effect today. *Id.* The 2006 regulations contain a set of mutually reinforcing requirements—all aimed at reducing employees' exposure to harmful levels of noise. *Id.* The new regulations set forth "minimum Federal health and safety noise standards for locomotive cab occupants" but do "not restrict a railroad… from adopting and enforcing additional or more stringent requirements." 49 C.F.R. § 227.1(b).

### (a)     *Locomotive design and maintenance standards.*

31.     The centerpiece of the revised regulations is a requirement that new locomotives be designed, built, and maintained to meet strict new noise standards. That regulation requires that "all locomotives of each design or model that are manufactured

after October 29, 2007, shall average less than or equal to 85 dB(A)." 49 C.F.R.
§ 229.121(a)(1). The regulations also prohibit railroads from "mak[ing] any alterations" to
locomotives to increase their average sound levels above established benchmarks and
require railroads to "maintain all pre-existing locomotives so that they do not reach
excessive noise levels." *Id.* § 229.121(a)(2); 71 Fed. Reg. at 63,076. As the FRA explained,
"since the early 1990s, the industry has taken delivery of thousands of newer locomotives
engineered to reduce noise levels." 71 Fed. Reg. at 63,072. "The cabs of most of these
locomotives provide an environment where, for the great majority of operating
circumstances, employees will not experience 8 hour TWA exposures approaching 90
dB(A)." *Id.*

### (b)    *Operational controls.*

32.    Building on these design and maintenance standards, the revised regulations
"encourage[] [railroads] to use noise operational controls" to reduce employees' exposure
to excessive noise. 49 C.F.R. § 227.113. "Operational controls refer to efforts to limit
workers' noise exposure by modifying workers' schedules or locations or by modifying
the operating schedule of noisy machinery." 71 Fed. Reg. at 63,101. The FRA lists several
non-exhaustive examples of operational controls, including "placement of a newer (i.e.,
quieter) locomotive in the lead" of a train; "rotation of employees in and out of noisy
locomotives"; and "variation of [an] employee's routes." Operational controls are
beneficial, according to the FRA, "because they help reduce the total daily noise exposure
of employees" and "take the burden off the employee to protect himself or herself" with
hearing protection. *Id.*

(c)     *Noise-monitoring and hearing-conservation programs.*

33.     The 2006 regulations for the first time required railroads to establish noise-monitoring and hearing-conservation programs. 49 C.F.R. § 227.103.

34.     The regulations governing noise monitoring require railroads to "take noise measurements under typical operating conditions" using a sound level meter or noise dosimeter. *Id.* § 227.103(c); 71 Fed. Reg. at 63,088. In making those measurements, the regulations require railroads to "use a sampling strategy that is designed to identify employees for inclusion in the hearing conservation program and to enable the proper selection of hearing protection." 49 C.F.R. § 227.103(b)(1). Where factors such as "high worker mobility, significant variations in sound level, or a significant component of impulse noise make area monitoring generally inappropriate," the regulations generally require railroads to "use representative personal sampling to comply with the monitoring requirements of this section." *Id.* § 227.103(b)(2). "Representative personal sampling means measurement of an employee's noise exposure that is representative of the exposures of other employees who operate similar equipment under similar conditions." *Id.* § 227.5. Although the FRA adopted a representative-sampling standard, the agency made clear that railroads remain "free to employ continuous monitoring," where each discrete workspace is monitored on an ongoing basis. 71 Fed. Reg. at 63,087.

35.     The regulations require railroads to administer a hearing-conservation program for all employees exposed to noise at or above "an eight-hour time-weighted-average sound level (TWA) of 85 dB(A)." 49 C.F.R. §§ 227.107, 227.5. Railroads must provide these employees with free "audiometric testing"—hearing exams—at least once

11

every three years. *Id.* § 227.109(b), (f). The results of the first exam serve as a "baseline audiogram"—essentially a snapshot in time of an employee's hearing ability against which future tests can be compared. *Id.* § 227.109(e).

### (d)    *Hearing protection.*

36.    Finally, the 2006 regulations established several new requirements governing the use of hearing protectors (or "HP").

37.    The regulations require railroads to "provide hearing protectors to employees" covered by the railroad's hearing-conservation program "at no cost to… employee[s]." *Id.* § 227.115(a)(1), (b). Railroads must "provide training in the use and care of all hearing protectors provided to employees," "ensure proper initial fitting," "supervise the correct use of all hearing protectors," and "replace hearing protectors as necessary." *Id.* § 227.115(a)(2), (5)-(6).

38.    The regulations "require the use of hearing protectors" when certain thresholds are met. *Id.* § 227.115(a). Employees who have not yet established a baseline audiogram or whose hearing has significantly worsened must wear hearing protection if they are exposed to sound levels equivalent to an 8-hour Time Weighted Average of 85 dB(A) or greater. *Id.* §§ 227.115(c), 227.5 (defining "Standard threshold shift," the metric for determining an actionable deterioration in hearing acuity). All other employees must "use… hearing protectors when [they are] exposed to sound levels equivalent to an 8-hour TWA of 90 dB(A) or greater." *Id.* § 227.115(d).

39.    Railroads must "give employees the opportunity to select their hearing protectors from a variety of suitable hearing protectors" including "devices with a range of

12

attenuation levels"—i.e. various devices that block a range of sound levels. *Id.* § 227.115(a)(4). This provision "underscore[s] the importance of railroads offering employees with [sic] sufficient options." 71 Fed. Reg. at 63,103. "When offering hearing protectors, employers should offer employees several different types, whether ear plugs, ear muffs, and/or electronic headsets. Within any given type, the employer should offer several different designs and models." *Id.* at 63,104. The regulations require a "range of attenuation levels" because railroads must "evaluate hearing protector attenuation for the specific noise environments in which the protector will be used." 49 C.F.R. § 227.117(a). Hearing protectors need only return the employee to noise exposures below the triggering threshold, "attenuat[ing] employee exposure to an 8-hour TWA of 90 decibels [or 85 decibels in the special cases described in the previous paragraph]." *Id.* § 227.117(b).

40.     The FRA makes railroads responsible for evaluating hearing-protector attenuation—in other words, determining how much sound a given pair of hearing protectors blocks—but gives them a wide range of options to make that determination. *See id.* § 227.117(a); 71 Fed. Reg. at 63,072. As a starting point, the FRA defines "hearing protector" broadly, as "any device or material, which is capable of being worn on the head, covering the ear canal or inserted in the ear canal; is designed wholly or in part to reduce the level of sound entering the ear; and has a scientifically accepted indicator of its noise reduction value." 49 C.F.R. § 227.5. That last clause—"scientifically accepted indicator of its noise reduction value"—is important. During the rulemaking, several stakeholders urged the FRA to mandate the "use [of] a specific indicator, the Noise Reduction Rating." 71 Fed. Reg. at 63,083. The FRA rejected using the Noise Reduction Rating ("NRR") as

the sole permissible indicator. *Id.* The FRA expressed concern that limiting the definition to a single standard "would prevent the industry from availing themselves of advances in science and technology." *Id.* The FRA also found it inappropriate to adopt the NRR standard because "there are several possible indicators that FRA could use and… there is not widespread public support for any particular one." *Id.* The Association of American Railroads—Union Pacific's industry group—also opposed using the NRR as the solely accepted benchmark:

> The [Association of American Railroads] wrote that railroads should not be limited to the NRR for evaluating [hearing protectors] attenuation, because it does not provide the flexibility to employ current science. The [Association of American Railroads] explained that there is current technology, such as in-the-ear microphones, which measure actual attenuation, and that technology would not be available if railroads were limited only to the NRR.

*Id.*

41.     The FRA's regulation on evaluating hearing-protector attenuation is also framed broadly. That regulation "directs that a railroad shall use one of" three evaluation methods: "derating by type, Method B from ANSI [American National Standards Institute] S12.6-1997… [or] objective measurement." *Id.* at 63,104; 49 C.F.R. § 227.117(a); *id.* Pt. 227, App. B. The FRA had originally proposed adopting the methods used in OSHA's regulations: the NRR and the National Institute for Occupational Safety and Health (NIOSH) methods #1, #2, and #3. 71 Fed. Reg. at 63,104. The FRA rejected these metrics and adopted the three it did as better suited to the railroad industry. *Id.* at 63,104-05. Only the first-listed method—derating by type—even mentions the NRR. 49 C.F.R. Pt. 227, App. B. Of the three available methods, objective measurement—where the evaluator

14

"[u]ses actual measurements of the level of noise exposure… inside the hearing protector when the employee wears the hearing protector in the actual work environment"—is the most accurate. 71 Fed. Reg. at 63,105.

42.     The regulations and FRA guidance broadly discourage railroads from mandating using any more hearing protection than necessary.

43.     Section 227.103(e) provides that, "in administering the monitoring program, a railroad shall take into consideration the identification of work environments where the use of hearing protectors may be omitted." 49 C.F.R. § 227.103(e). "The purpose of this provision is to ensure that railroads do not excessively rely on reflexive use of hearing protectors when structuring their hearing conservation programs." 71 Fed. Reg. at 63,088. Section 227.103(e) requires railroads to use the information gleaned from their noise-monitoring programs to "determine general categories of work assignments that require hearing protectors and those that do not." *Id.* "Examples of situations where hearing protection may be omitted include… '[g]round' assignments where employees… have limited exposure to loud and persistent noise sources such as locomotives" and "[c]abs designed for sound reduction." *Id.* As the FRA recognized in 2006, "over the past decade and a half, the locomotive fleet has come to be dominated by cabs that are sufficiently quieter such that hearing protection is not required under most conditions of operation." *Id.* at 63,076.

44.     The FRA has repeatedly emphasized that "several benefits… accrue when employees refrain from over-using hearing protectors." *Id.* Working without hearing protection "maximiz[es] the availability of auditory cues…which results in improved

personal safety." *Id.* In addition, "[o]verprotection can erode compliance." *Id.* When employees are "instructed to wear HP at all times and in all circumstances, it creates the impression for the employee that the HP requirement is just a pro forma requirement, not part of a larger program designed to protect their hearing. With that mindset, the employee is less likely to wear HP." *Id.*

45.    Other regulatory provisions reinforce these same goals. Section 227.115(a)(4) requires railroads to "give employees the opportunity to select their hearing protectors from a variety of suitable hearing protectors" including "devices with a range of attenuation levels." 49 C.F.R. § 227.115(a)(4). Section 227.115(a)(3) provides that "[w]hen offering hearing protectors, a railroad shall consider an employee's ability to understand and respond to voice radio communications and audible warnings." *Id.* § 227.115(a)(3). These requirements address the "FRA's concern that the overuse of hearing protection may be counter-productive, especially for employees with existing hearing loss." 71 Fed. Reg. at 63,102. "In addition to offering devices with high attenuation, railroads should offer devices with low or moderate attenuation." *Id.* at 63,104. "[A]n employer should provide HP types with ranges that are sufficient to protect the employee from the level of noise expected but still permit the employee to communicate effectively for the job." *Id.* For example, an employee "who is exposed to a TWA of 85 or 86 dB(A),"—the minimum possible threshold for required hearing protection—"should not wear HP that provides 30 dB in noise reduction, because that will reduce the employee's hearing ability and thus the employee's ability to listen and communicate in the cab." *Id.* at 63,102.

**(2)** **The FRA's engineer- and conductor-certification rules.**

46.     Congress has also mandated rules for certifying locomotive engineers and conductors.[1]

47.     The FRA first adopted rules for certifying engineers in 1991. Qualifications for Locomotive Engineers, 56 Fed. Reg. 28228-01 (June 19, 1991). The goal of the certification rule was to set out minimum qualification standards for locomotive engineers. *Id.*

48.     Relevant here, in order to be certified as an engineer, a person:

> shall have hearing acuity that meets or exceeds the following thresholds when tested by use of an audiometric device (calibrated to American National Standard Specification for Audiometers, S3.6-1969): the person does not have an average hearing loss in the better ear greater than 40 decibels at 500Hz, 1,000 Hz, and 2,000 Hz *with or without use of a hearing aid*.

49 C.F.R. § 240.121(d) (emphasis added). A person who fails this hearing test may still be certified as an engineer, however, with or without "special restrictions," "[i]f, after consultation with one of the railroad's designated supervisors of locomotive engineers, the medical examiner concludes that… the person has the ability to safely operate a locomotive." *Id.* § 240.121(e).

---

[1] Conductors and locomotive engineers are separate and distinct jobs in the railroad industry. A conductor is defined as a "crewmember in charge of a 'train or yard crew.'" 49 C.F.R. § 242.7. A locomotive engineer is generally defined as a "person who moves a locomotive." 49 C.F.R. § 240.7.

49.     At Congress' direction, the FRA issued new regulations, effective in 2012, requiring railroads to implement a program for certifying conductors. Conductor Certification, 76 Fed. Reg. 69,802 (Nov. 9, 2011).

50.     The new rule "prescribes minimum Federal safety standards for the eligibility, training, testing, certification and monitoring of all [covered] conductors." 49 C.F.R. § 242.1(b). Its purpose is "to ensure that only those persons who meet minimum Federal safety standards serve as conductors." *Id.* § 242.1(a).

51.     The conductor-certification rule was modeled after the engineer-certification rule adopted by the FRA in 1991. *Compare* 76 Fed. Reg. 69,802, *with* 56 Fed. Reg. 28228-01.

52.     Most relevant here, the new conductor regulations require that a person pass a hearing exam to be certified as a conductor. The rule governing hearing exams provides that:

> [E]ach person shall have a hearing test or audiogram that shows the person's hearing acuity meets or exceeds the following thresholds: The person does not have an average hearing loss in the better ear greater than 40 decibels *with or without the use of a hearing aid*, at 500 Hz, 1,000 Hz, and 2,000 Hz.

*Id.* § 242.117(i) (emphasis added). A person who fails this hearing test may still be certified as a conductor, however, with or without "special restrictions," "[i]f, after consultation with a railroad officer, the medical examiner concludes that… the person has the ability to safely perform as a conductor." *Id.* § 242.117(j); *see also id.* § 242.117(c)(2).

53.     The standards governing hearing acuity for locomotive engineers and conductors are the same. And nothing in the engineer-certification or conductor-

certification regulations or the FRA's implementing guidance suggests that engineers or conductors who may be required to wear hearing protection must meet the hearing-acuity thresholds set forth in Sections 240.121(d) or 242.117(i) *while wearing hearing protection*. *See generally* 49 C.F.R. Pts. 240 and 242; 56 Fed. Reg. at 28,228-76; 76 Fed. Reg. at 69,802-66. The hearing-acuity regulations simply require meeting the stated thresholds "with or without the use of a hearing aid." 49 C.F.R. §§ 240.121(d), 242.117(i).

54.     The FRA's engineer-certification and conductor-certification regulations require railroads to put any adverse certification decisions in writing and set forth "the basis for [the] denial decision." *Id.* §§ 240.219(c), 242.401(c). The aggrieved employee "may petition the [FRA] to review the railroad's decision." *Id.* §§ 240.401(a), 242.501(a). The FRA then "determine[s] whether the denial or revocation of certification or recertification was improper under this regulation… and grant[s] or den[ies] the petition accordingly." *Id.* §§ 240.405(f), 242.505(k).

**D.     Union Pacific Adopts a Hearing Protection Policy that Is More Stringent than What the FRA Regulations Require.**

55.     Union Pacific has adopted a hearing-protection policy that is far more stringent than—and in some cases directly contradicts—the FRA's standards.

56.     Despite the FRA's admonition that railroads should not "excessively rely on reflexive use of hearing protectors when structuring their hearing conservation programs," 71 Fed. Reg. at 63,088, Union Pacific formally requires all conductors to wear hearing protection. *Mlsna v. Union Pacific R.R. Co.*, 3:18-cv-00037, ECF Nos. 51-5, at 3, and 51-9, at 3 (W.D. Wis.).

19

57.     Union Pacific also requires all employees, including conductors, "to wear approved hearing protection in identified hearing protection areas" demarcated by signs and whenever they are within 150 feet of a locomotive, unless they are inside the cab with the doors and windows closed. Exhibit 2, at 1, 3, 6 (Union Pacific's "Hearing Conservation" policy).

58.     In support of its more-stringent policy, Union Pacific claims it engaged in "representative sampling designed to measure a conductor's noise exposure" as "required by the FRA," and learned that 13 percent (22 of 172) of "thru-freight" conductors and 7 percent (6 of 91) of "local" conductors were exposed to an 8-hour Time Weighted Average of over 90 decibels. *Mlsna*, 3:18-cv-00037, ECF No. 51, at 7.

59.     Based on this data, Union Pacific claims that, even now, conductors are "certain to encounter" excessive noise. Br. for Union Pacific at 41, *Mlsna*, 975 F.3d 629.

60.     Union Pacific's claim is baseless, and its use of statistical evidence is highly misleading. The noise-sampling evidence gathered by Union Pacific consists of records of average noise exposure from five different railroads during a period spanning from 1980 to 2017. *Mlsna*, 3:18-cv-00037, ECF Nos. 53-5, at 1, and 53-6 at 1 (the "Lavg" column contains the relevant Time Weighted Average figures).

61.     The inclusion of old data is particularly problematic because, as previously discussed, the FRA mandated the use of quieter locomotives beginning in 2007, and railroads voluntarily began "tak[ing] delivery of thousands of newer locomotives engineered to reduce noise levels" in the 1990s. 49 C.F.R. § 229.121(a)(1); 71 Fed. Reg. at 63,072.

20

62.     For example, Union Pacific has highlighted the fact that one conductor in the sample was exposed to an 8-hour Time Weighted Average of 97 decibels—the highest measured noise dose in the sample. *Mlsna*, 3:18-cv-00037, ECF No. 51, at 7. But this measurement was taken in 1991. *Mlsna*, 3:18-cv-00037, ECF No. 53-5, at 1. Conversely, inclusion of data from other railroads is hardly relevant and contravenes the FRA's requirement that railroads do their own sampling. 49 C.F.R. § 227.103(b)(2).

63.     The *relevant* data collected by Union Pacific tells a dramatically different story. Looking exclusively at measurements taken on or after February 26, 2007 (the date the FRA regulations mandating sampling took effect) by Union Pacific (not other railroads), zero percent (0 of 64) of "thru-freight" conductors were exposed to an 8-hour Time Weighted Average of 90 decibels or greater. *Mlsna*, 3:18-cv-00037, ECF No. 53-5, at 1.

64.     In fact, all but one of the measurements exceeding the 90-decibel threshold were taken in the 1980s and 90s. *Id.* Even examining all of the thru-freight conductor data (for all railroads) shows that out of 172 readings, 22 recorded an 8-hour TWA of 90 or greater. Twenty-one of these samples were taken between 1988 and 1992. The single most recent measurement meeting or exceeding the 90-decibel threshold was taken in 2001. *Id.*

65.     Conversely, only 3.5 percent (2 of 56) of local conductors employed by Union Pacific were exposed to an 8-hour Time Weighted Average of 90 decibels or greater. *Mlsna*, 3:18-cv-00037, ECF No. 53-6, at 1. And those two measurements revealed noise levels at 91 decibels—just above the 90-decibel threshold—over a very short period of time—78 minutes, to be precise. *Id.* Even these measurements reveal no evidence of

excessive noise. Under the governing regulations, an average sound level of 91 decibels is permitted for a full seven hours. *See* 49 C.F.R. 227 Appendix A, Table A-2.

66.     The complete absence of evidence supporting Union Pacific's claim that its employees are currently exposed to noise exceeding the legal threshold aligns perfectly with the FRA's observation in 2006 that "the locomotive fleet has come to be dominated by cabs that are sufficiently quieter such that hearing protection is not required under most conditions of operation." 71 Fed. Reg. at 63,076. As the Seventh Circuit bluntly observed, the decades-old data showing exposures to excessive noise is "not relevant." *Mlsna*, 975 F.3d at 635. On the contrary, "[t]he data show no dangerous noise levels to which [conductors were] exposed" during the relevant timeframe. *Id.*

67.     Despite Union Pacific's formal policy broadly requiring hearing protection, the practice among employees on the ground is another matter. Union Pacific's hearing protection rules are not stringently enforced.

**E.     Union Pacific Adopts a Hearing-Testing Policy that Is Facially Discriminatory Against Hearing-Impaired Employees.**

68.     The heart of this case, however, concerns Union Pacific's adoption of an overbroad and outright discriminatory hearing-exam policy.

69.     Despite the fact that the FRA's hearing-acuity requirements only apply to locomotive engineers and conductors, Union Pacific applies these hearing-acuity rules more broadly to all train and engine employees, including brakemen, switchmen, firemen, yardmen, and other similar railroad employees.

70.     In other words, Union Pacific will disqualify from service *any train employee* who has "an average hearing loss in the better ear greater than 40 decibels." 49 C.F.R. §§ 240.121(d), 242.117(i).

71.     Union Pacific not only applies the FRA's acuity standards to all train employees, but it does so in a highly distorted and discriminatory manner.

72.     Union Pacific requires all train employees (including those with hearing impairments) to take a hearing test *without hearing aids*. Exhibit 3, at 3 (Union Pacific letter to Mark Mlsna).

73.     If the test subject satisfies the FRA's threshold—that is, "[t]he person does not have an average hearing loss in the better ear greater than 40 decibels… at 500 Hz, 1,000 Hz, and 2,000 Hz"—he passes. *Id.* No further testing is required. *Id.*

74.     Union Pacific enforces a different requirement on hearing-impaired employees. Per Union Pacific's policy, a train employee who satisfies the FRA's hearing-acuity threshold while wearing hearing aids does not pass the exam, cannot be certified as a conductor or an engineer, and cannot continue working in his position for Union Pacific. Exhibit 3, at 3; *Mlsna*, 3:18-cv-00037, ECF No. 51-5, at 4.

75.     In order for hearing-impaired employees to pass the hearing test, Union Pacific requires these employees (and only these employees) to satisfy the FRA's hearing-acuity threshold *while wearing hearing protection* and *without hearing aids*. Exhibit 3, at 3; *Mlsna*, 3:18-cv-00037, ECF No. 51-5, at 4.

76.     Union Pacific mandates the use of a single-hearing protection device for all hearing-impaired conductors: the "Pro Ears – Gold" device. *Mlsna*, 3:18-cv-00037, ECF No. 51-5, at 4.

77.     The Pro Ears – Gold device is an Amplified Hearing Protection Device (or "AHPD"), an electronic ear-muff style hearing protector with an external microphone and internal speaker designed to "amplif[y] ambient sound but block[] noise over 85 decibels." *Mlsna*, 3:18-cv-00037, ECF No. 53-1, at 3.

78.     The device is marketed to hunters and "makes no mention of its appropriateness for use by individuals with [a] hearing impairment." *Mlsna*, 3:18-cv-00037, ECF No. 48, at 4.

79.     Thus, under Union Pacific's policies, a hearing-impaired employee who cannot pass the FRA's hearing-acuity test without hearing aids is deemed to have passed his hearing exam, *only* if he satisfies the FRA's hearing-acuity threshold while wearing the Pro Ears – Gold device. Exhibit 3, at 3; *Mlsna*, 3:18-cv-00037, ECF Nos. 53-1, at 4.

80.     This is the case even if the hearing-impaired employee *can* pass the test *with* hearing aids—which is all that the FRA requires to pass the test. § 242.117(i).

81.     Cumulatively, these policies produce a startling result: Union Pacific flatly prohibits hearing-impaired employees from working on its trains if they need hearing aids to pass the FRA requirements.

82.     Union Pacific's testing regime thus facially discriminates against hearing-impaired employees by directly screening them out.[2]

83.     Only hearing-impaired employees are required to meet the FRA's hearing-acuity threshold *while wearing hearing protection*. Exhibit 3, at 3.

84.     An employee who passes the exam without hearing aids—even barely passes—is not then required to meet the FRA's hearing-acuity threshold while wearing hearing protection. Exhibit 3, at 3. Under Union Pacific's policies, only hearing-impaired employees must do so. *Id.*

85.     Union Pacific's policy actually ensures that some employees who *pass* Union Pacific's test will have *greater hearing loss* on the job compared to the disabled employees who fail. Consider two hypothetical employees. Smith wears hearing aids. With his hearing aids in, he has no hearing loss. Without hearing aids, his "average hearing loss in the better ear" is 41 decibels—just shy of meeting the FRA acuity threshold. While wearing standard earmuffs and hearing aids, Smith's average hearing loss in the better ear is 30 decibels. While wearing Union Pacific's approved Pro Ears Gold device, his average hearing loss in the better ear is 56 decibels. Union Pacific will not certify Smith and will not allow Smith to continue working. Now consider Jones. Jones does not wear hearing aids, but he does have some mild hearing loss: his "average hearing loss in the better ear" is 39 decibels—just good enough to meet the FRA acuity threshold. When Jones wears the same standard

---

[2] In the alternative, if Union Pacific's testing regime is deemed a facially neutral policy, it has an obvious disparate impact on hearing-impaired employees, who bear the entire brunt of the adverse actions Union Pacific has taken under the discriminatory policy.

earmuffs as Smith, however, his hearing is attenuated an additional 30 decibels: his "average hearing loss in the better ear" is now *69 decibels*. Union Pacific will certify Jones—the employee whose hearing loss while wearing hearing protection is far worse than Smith's—and permit Jones to continue working.

86.     This is wildly discriminatory. If Union Pacific in fact believed it was essential for employees to meet the FRA standards while wearing hearing protection, Union Pacific would require *all employees* to undergo auditory testing *while wearing* hearing protection to ensure that they can do so. But it does not. Instead, Union Pacific assumes that nondisabled employees are good enough while setting up disabled employees to fail by forcing them to undergo testing with a device that often *makes their hearing worse*.

87.     Nor can Union Pacific's discriminatory hearing-exam protocol be justified by the FRA regulations.

88.     Those regulations require only that a "person does not have an average hearing loss in the better ear greater than 40 decibels" "with or without use of a hearing aid." 49 C.F.R. § 240.121(d); *id.* § 242.117(i).

89.     If a person's test shows that he does not have an average hearing loss in the better ear greater than 40 decibels while wearing hearing aids, then he has passed the test necessary for him to be certified or recertified as a conductor or an engineer.

90.     The FRA's regulations do not require *anyone* to be tested while wearing hearing protection.

91.     But it is even more indefensible to suggest, as Union Pacific does, that *only employees who wear hearing aids* must pass this test while wearing hearing protection.

**F.    Union Pacific's Hearing Protection and Hearing-Testing Policies Are Inconsistent with the FRA Regulations.**

92.     Union Pacific's hearing exam protocol is discriminatory in other ways as well. By enforcing a series of strict and legally unsupported limitations, Union Pacific unduly restricts the manner in which hearing-impaired employees can safely perform the job.

93.     Union Pacific categorically prohibits the use of hearing aids as hearing protection.

94.     Union Pacific enforces this prohibition even though some modern hearing aids can attenuate loud noise and thus provide hearing protection.

95.     Union Pacific also formally prohibits hearing-impaired employees from wearing hearing protectors over hearing aids, an arrangement that the FRA regulations permit. *Id.* § 227.115(a)(4).

96.     Indeed, OSHA, which administers hearing regulations that are in many respects similar to the FRA regulations, has recommended on several occasions that employees wear hearing protection over hearing aids. *See* OSHA, *Application of the Occupational Noise Standard to Employees Who Are Deaf or Have a Diminished Capacity to Hear* (Aug. 3, 2004) ("Employees should… leave their hearing aids on and wear ear muffs with sufficient attenuation to reduce all workplace noise below" the actionable

threshold.); OSHA, *Hearing Conservation for the Hearing-Impaired Worker* 4 (Dec. 27, 2005) ("[O]n a case-by-case basis, hearing aids can be worn underneath an earmuff.").

97. Union Pacific's requirement that all hearing-impaired employees use a single pre-approved device—the Pro Ears – Gold device—runs afoul of its obligation to "give employees the opportunity to select their hearing protectors from a variety of suitable hearing protectors." *Id.* Railroads are required to "offer employees several different types [of hearing protectors], whether ear plugs, ear muffs, and/or electronic headsets. Within any given type, the employer should offer several different designs and models." 71 Fed. Reg. at 63,104 (emphasis added).

98. Union Pacific's policy also fails to provide hearing-impaired employees with a "range of attenuation levels" to best accommodate "the specific noise environments in which the protector will be used." 49 C.F.R. § 227.117(a). Union Pacific's Pro Ears – Gold device has an attenuation rating of 30 decibels—on the very high end of the attenuation scale. *Mlsna*, 3:18-cv-00037, ECF No. 51-5, at 4. But as the FRA has cautioned, attenuation overkill is bad: an employee whose work environment is right at the threshold for requiring hearing protection should not wear high-attenuation hearing protectors. 71 Fed. Reg. at 63,102; 49 C.F.R. § 227.117(a).

99. Union Pacific prohibits the use of any hearing protection device that does not include a NRR from the manufacturer. *Mlsna*, 3:18-cv-00037, ECF Nos. 60, at 3-4, and 64, at 20.

100. This limitation, naturally, further constrains the hearing protection options available to hearing-impaired employees who are attempting to pass Union Pacific's

28

discriminatory test. But, for the reasons already discussed, Union Pacific's insistence that all approved devices have an NRR is both legally and scientifically unsupported—not to mention shockingly hypocritical. FRA regulations defines "hearing protector" broadly— without any requirement that hearing protectors include an NRR. 49 C.F.R. § 227.5. That omission was no accident. During the rulemaking, several commenters urged the FRA to mandate the "use [of]…the Noise Reduction Rating." 71 Fed. Reg. at 63,083. The FRA explicitly rejected calls to mandate the NRR, expressing its concern that limiting the definition to a single standard "would prevent the industry from availing themselves of advances in science and technology." *Id.*

101.    The FRA also found it inappropriate to adopt the NRR standard because "there are several possible indicators that FRA could use and… there is not widespread public support for any particular one." *Id.* The FRA similarly rejected calls to mandate the NRR as one of the listed methods available to railroads to measure hearing protection attenuation. 71 Fed. Reg. at 63,104-05; 49 C.F.R. § 227.117(a); 49 C.F.R. Pt. 227, App. B.

102.    What's more, the FRA rejected the use of the NRR *at the urging of Union Pacific*. Union Pacific's trade group—the Association of American Railroads—opposed enshrining the NRR as the solely accepted benchmark for measuring hearing protection attenuation. 71 Fed. Reg. at 63,083. Instead, Union Pacific argued to the FRA that "railroads should not be limited to the NRR for evaluating [hearing protectors] attenuation, because it does not provide the flexibility to employ current science." *Id.* It further "explained that there is current technology, such as in-the-ear microphones, which measure

actual attenuation, and that technology would not be available if railroads were limited only to the NRR." *Id.*

103. The Association of American Railroads was correct in what it told the FRA. The NRR is far from the solely accepted way to measure the extent to which hearing protectors attenuate noise. Other methods, including objective measurement, are far more accurate. With respect to the NRR, then, Union Pacific is talking out of both sides of its mouth. When dealing with the U.S. government, Union Pacific's trade group insists that mandating the use of the NRR would unfairly constrain railroads and spurn science. When dealing with its disabled employees, however, Union Pacific is more than willing to impose the very same arbitrary and discredited limitations.

104. Union Pacific also prohibits custom earplugs because it claims that "the quality of the custom mold can be highly variable," and that "without a noise reduction rating Union Pacific cannot determine the level of protection, which it considers a safety hazard for employees." *Mlsna*, 3:18-cv-00037, ECF No. 60, at 3-4.

105. But FRA regulations permit the use of custom earplugs. 49 C.F.R. § 227.5. And custom earplugs are more reliable—not less—than off-the-shelf earplugs. Custom molding ensures a fit tailored to the wearer's unique ears. The fact that custom earplugs lack an NRR is also no reason to prohibit their use. For the reasons stated in above, there is no valid reason to reject hearing protectors that lack an NRR. Noise attenuation can be measured according to several other scientifically accepted methods.

106.    Union Pacific also prohibits employees from using any hearing protection devices that are not pre-approved by Union Pacific's Industrial Hygiene department. *Mlsna*, 3:18-cv-00037, ECF No. 60, at 3.

107.    And Union Pacific has only approved a single device—the Pro Ears – Gold—for use by hearing-impaired employees.

108.    Collectively, these mutually reinforcing restrictions amount to a fearsome policy, pattern, and practice of discrimination against hearing-impaired employees. Not only are hearing-impaired employees forced to pass a discriminatory test, but they are made to do so, figuratively speaking, with both hands and both feet tied behind their backs.

109.    Effectively, hearing-impaired employees cannot continue working for Union Pacific unless they meet the FRA's hearing-acuity threshold without wearing hearing aids and while wearing a single preselected headset that was never designed for hearing-impaired individuals.

**G.    Union Pacific's Hearing Protection and Hearing Exam Policies Collectively Amount to an Ongoing Policy, Pattern, and Practice of Discrimination Against Hearing-Impaired Employees.**

110.    Union Pacific's hearing-protection and hearing-exam policies collectively amount to an ongoing policy, pattern, and practice of discrimination against hearing-impaired employees. These policies have been in effect since at least 2014—and possibly earlier—and remain in effect to this day.

**H.    Grigg Is Held Out of Service Pursuant to Union Pacific's Discriminatory Hearing-Testing Policy.**

111.    The Plaintiff in this case, Charlie Grigg, was one of many victims of Union Pacific's discriminatory policies.

112.    Grigg's hearing never interfered with his ability to perform his job duties as a train conductor.

113.    Since the time of his hiring by Union Pacific until the summer of 2018, Grigg underwent mandatory hearing tests by Union Pacific approximately every three years, which he passed.

114.    In the summer of 2018, Grigg decided to get hearing aids. He saw a private audiologist, who fitted him with hearing aids. With his hearing aids in, Grigg has minimal hearing loss.

115.    Grigg purchased his own ear protection to wear over his new hearing aids.

116.    When Grigg wore his own earmuffs over his hearing aids, he could hear adequately and perform his job safely.

117.    Even without his hearing aids in, and when wearing Union Pacific's standard hearing protection, Grigg could perform his job duties as a train conductor at full capacity, despite his hearing impairment.

118.    In or around July of 2018, Union Pacific required Grigg to sit for a hearing exam. At this exam, Grigg was tested without his hearing aids and without hearing protection. Without his hearing aids, Grigg did not meet the FRA's hearing-acuity threshold.

119.    Union Pacific by this point required all train employees to meet the FRA's acuity threshold with unaided hearing *or* while wearing the Pro Ears – Gold headset.

120.    In or around July of 2018, Union Pacific informed Grigg that it was initiating a hearing examination to assess his fitness for duty and removed him from service.

121.    Shortly thereafter, Union Pacific required Grigg to undergo additional examination by its own preferred audiologist. Grigg was required to drive approximately 140 miles to see this audiologist at Union Pacific's preferred testing location.

122.    At this examination, Union Pacific's audiologist examined Grigg both with and without his hearing aids.

123.    With his hearing aids in, Grigg easily passed the test, meeting the FRA's hearing-acuity threshold.

124.    Nevertheless, he was informed that the rules required him to meet the FRA's hearing-acuity requirements *without* his hearing aids in, which he could not do.

125.    Union Pacific's audiologist also tested Grigg's hearing with an AHPD, but without hearing aids. Grigg was told he did not pass the test using Union Pacific's AHPD without his hearing aids.

126.    This is unsurprising. Whatever gain in hearing acuity people like Grigg receive from wearing an AHPD, those gains are mostly if not entirely wiped out by the device's sound-blocking function. AHPDs certainly allow the wearer to hear better than he would be able to while wearing a standard, non-electronic set of earmuffs or earplugs. But AHPDs are still primarily hearing protectors. As such, they naturally block a great deal of sound.

127.   Based on these test results, Union Pacific refused to allow Grigg to return to work as a conductor.

128.   That decision was a direct consequence of Union Pacific's discriminatory policy. Non-hearing-impaired employees are *not required* to meet the FRA's acuity threshold (that is, have hearing loss in the better ear that is no greater than 40 decibels) while wearing hearing protection.

129.   Union Pacific holds scores of hearing-impaired employees out of service; meanwhile, it allows thousands of engineers, conductors, and other train employees to continue working even though their hearing loss while wearing hearing protection is *worse* than many of these hearing-impaired individuals' hearing loss while wearing hearing protection.

130.   After the hearing tests and through the winter of 2018, Grigg was held out of service and received no pay.

131.   During this time, Grigg repeatedly asked Union Pacific if anything could be done to return him to service as a conductor so that he could continue to receive a paycheck. Union Pacific did nothing.

132.   Although Grigg fully believed he was capable of performing his job as a train conductor, with or without his hearing aids in, he also stood willing to transfer to another position. In fact, he discussed the possibility of changing positions with his supervisor. Grigg's supervisor said he thought it was a good idea and that perhaps Grigg could be retrained for another Union Pacific job. Grigg was agreeable to this plan. However, weeks passed, and Union Pacific never secured him the position and never retrained him.

133.    Finally, Union Pacific suggested to Grigg that if he needed a paycheck, he should retire early. Seeing no other option, Grigg applied for his retirement benefits. As a result of retiring earlier than he had wanted, Grigg lost a substantial portion of his monthly retirement payments. Had he not been discriminated against, Grigg would have continued working.

## I.    Grigg Performed the Essential Functions of His Job.

134.    Grigg has always been able to perform the essential functions of his job as a conductor. His disability has not impaired his ability to do his job, and he has excelled at his work.

135.    Wearing hearing protection in every circumstance covered by Union Pacific's policies is a non-essential function. Wearing hearing protection is an essential function only when required by the FRA's regulations. And there is no evidentiary basis to conclude that the FRA regulations required Grigg to use hearing protection.

136.    A number of factors support the conclusion that Union Pacific's more stringent hearing-protection standards are non-essential functions. A train employee's position would not be fundamentally altered if hearing protection were required by Union Pacific only when mandated by the FRA regulations. Indeed, a reasonable observer watching a conductor, engineer, or similar employee do his job would likely perceive no difference.

137.    Union Pacific's job description supports the same conclusion. The job description lists one-and-a-half pages of tasks that are explicitly labeled as "essential job functions." Exhibit 1, at 1-2. The job description's requirement that conductors "wear

personal protective equipment such as… hearing protection where the company requires" appears several pages later and without any such label. *Id.* at 4.

138.  Evidence of the Union Pacific's actual practices in the workplace further supports the same point. Many Union Pacific employees do not wear hearing protection despite Union Pacific's policy. And although Union Pacific formally prohibits wearing hearing protection over hearing aids, it is common practice for hearing-impaired employees to purchase their own ear protection and, as Grigg did, wear it over their hearing aids.

139.  The FRA's regulations themselves amount to powerful evidence that they represent the essential requirements of wearing hearing protection. The agency's expertise in railroad safety and careful science-based approach in rulemaking illustrate that employees may safely perform their jobs without hearing protection when not required. This regulatory judgment strongly suggests that any additional requirements imposed by railroads are non-essential functions under the ADA.

140.  Because the FRA's hearing-protection standards—and not Union Pacific's more stringent policies—capture the essential functions of the job, it follows that wearing hearing protection was not an essential function of Grigg's job because there is no evidence that he was exposed to levels of noise sufficient to trigger the FRA's hearing-protection requirement.

141.  The FRA standards, which require hearing protection only "when an employee is exposed to sound levels equivalent to an 8-hour TWA of 90db(A) or greater." 49 C.F.R. § 227.115(d). There is no evidence that Grigg or other similarly situated employees were ever exposed to such sound levels. While the FRA regulations mandate

36

sampling, railroads remain "free to employ continuous monitoring," where each discrete workspace is monitored on an ongoing basis. 71 Fed. Reg. at 63,087. There is no evidence that Union Pacific has ever done this.

142.   The linchpin of Union Pacific's argument is the sampling data that it claims shows that conductors and similarly situated employees are sometimes exposed to noise levels meeting or exceeding an 8-hour Time Weighted Average of 90db(A). But Union Pacific's own evidence utterly fails to substantiate its claim. Samples of Union Pacific thru-freight conductors taken between 2007 and 2017 show that zero percent (0 of 64) of thru-freight conductors were exposed to an 8-hour Time Weighted Average of 90 decibels or greater. *Mlsna*, 3:18-cv-00037, ECF No. 53-5, at 1. The single most recent measurement meeting or exceeding the 90-decibel threshold was taken in 2001—the rest were taken in the 1980s and 90s. *Id.* The same is true for local conductors, who Union Pacific's own data confirm were not exposed to excessive noise. The stark differences between the older and newer samples make perfect sense in light of the FRA's mandated use of quieter locomotives beginning in 2007 and railroads' voluntary purchase "of thousands of newer locomotives engineered to reduce noise levels" starting in the 1990s. 49 C.F.R. § 229.121(a)(1); 71 Fed. Reg. at 63,072.

143.   There is a complete absence of evidence supporting the claim that Grigg was exposed to noise levels meeting or exceeding an 8-hour TWA of 90db(A).

144.   Even assuming that wearing hearing protection is an essential function, it is not an essential function of train employees' positions to pass the FRA's hearing acuity test *while wearing* hearing protection.

145.    Union Pacific has "consistently articulated that it [cannot] certify [conductors when they do] not meet FRA minimum standards when wearing mandatory, approved hearing protection." *Mlsna*, 3:18-cv-00037, ECF No. 51, at 36. But Union Pacific's position rests upon a gross misinterpretation of the governing regulations.

146.    Most obviously, the plain text of the governing regulation makes no mention of wearing hearing protection. The hearing test must show, without qualification, that "[t]he person does not have an average hearing loss in the better ear greater than 40 decibels *with or without the use of a hearing aid*, at 500 Hz, 1,000 Hz, and 2,000 Hz." 49 C.F.R. §§ 242.117(i), 240.121(d) (emphasis added). Had the FRA wished to require testing with hearing protectors, it certainly would have said so directly. *See Mlsna*, 975 F.3d at 636 ("If the hearing acuity regulation was meant to require hearing protection, it could have said so, but it does not.").

147.    Other indicia of the FRA's intent support the same result. The FRA's conductor-certification regulation was adopted in 2011—five years after the FRA issued its comprehensive occupational-noise standards for railroads, including the use of hearing protection. The FRA knew in 2011 that some railroad employees may be required to wear hearing protection. Yet it adopted a hearing-test regime that makes no mention of hearing protection. *See generally* 49 C.F.R. Pt. 242; 76 Fed. Reg. at 69,802-66.

148.    Union Pacific's contrary claim is principally based on a practical argument: if an employee is required to both pass a hearing exam and wear hearing protection (which Grigg disputes, but here is assumed), then of course he must pass the hearing exam while wearing hearing protection. If he can't meet the acuity thresholds under all possible

circumstances then he can't hear well enough to do the job. But this argument contains a flawed premise: the assumption that the FRA's hearing-acuity standards represent the actual physical minimum requirement for hearing under any circumstances in the conductor position. The opposite premise is stronger: that the FRA's hearing-acuity threshold represents an ability level that would permit someone to work as a conductor under a variety of circumstances—including with or without hearing protection.

149.    Under the FRA regulations, the potential use of hearing protection is fully baked into the FRA's hearing-acuity testing standard. The FRA standard requires hearing loss of no greater than 40 decibels in the better ear. 49 C.F.R. §§ 242.117(i), 240.121(d). A hearing loss of 40 decibels is considered "mild." *See* JG Clark, Uses and Abuses of Hearing Loss Classification, 493-500 (1981). As hearing deteriorates further, it is classified progressively as "moderate," "moderate severe," "severe," and "profound." *Id.* It is not unreasonable to assume that someone with normal hearing or mild hearing loss could safely attenuate his hearing a little further with hearing protectors and still safely perform as a conductor.

150.    The FRA fully agrees with Grigg's interpretation of the hearing-acuity regulation. In the *Mlsna* case, the FRA reversed Union Pacific's decision to revoke Mlsna's conductor certification. *See* Exhibit 4 (FRA's Operating Crew Review Board decision). The FRA's opinion was unsparing and blunt, explaining that Union Pacific's claim that hearing-impaired employees must meet the FRA's acuity thresholds *while wearing hearing protection* was based on "flagrant misrepresentations" of the FRA's hearing-test requirements. *Id.* at 4. The regulations, the FRA held, "permit[] the hearing standard set

39

forth in 49 C.F.R. § 242.117(i) to be met 'with or without use of a hearing aid.'" *Id.* Nothing more is required. *Id.*

151.    But even if Union Pacific's creative interpretation of the hearing-protection and hearing-acuity regulations were correct, it would still face a big problem. Union Pacific's hearing-exam protocol is discriminatory. Union Pacific's claimed requirement that hearing-impaired employees must meet the FRA's hearing-acuity standards while wearing hearing protection cannot be an essential function because Union Pacific does not impose the same requirement on non-hearing-impaired employees. Exhibit 3, at 3. Union Pacific cannot credibly claim that a requirement it does not impose on the vast majority of its workforce is in fact essential.

152.    Grigg was qualified to continue working as a train conductor. He passed his hearing exam. He can do the job without wearing hearing protection. He can do the job while wearing hearing protectors. And he could do the job wearing any number of AHPDs that are on the market. Any of these modest accommodations is reasonable; and none would remove any essential functions from his role.

**J.    Grigg Asks for a Reasonable Accommodation.**

153.    After he was removed from service, Grigg repeatedly asked Union Pacific for reasonable accommodations. He asked to return to work and perform his job, which he was fully capable of performing with his new hearing aid and earmuffs. He also asked to be retrained to work in another position.

154.    Union Pacific was unmoved. As discussed above, Union Pacific requires all hearing-impaired employees to use a single device—the Pro Ears Gold—that was selected

40

by Union Pacific. Union Pacific told Grigg that nothing could be done and made no effort to work with him to find a reasonable accommodation.

155.   Union Pacific's restrictive policies, however, dramatically constrain the search of reasonable accommodations. Union Pacific insists that all hearing-impaired employees use a single company-approved device. That requirement is itself based on a cascading series of arbitrary and illegal company policies. First, as already discussed, Union Pacific required all hearing-impaired employees to be able to meet the FRA's acuity thresholds while wearing the device. This policy ruled out a wide range of other devices. Second, Union Pacific prohibited the use of any device where the manufacturer did not publish an NRR. *Mlsna*, 3:18-cv-00037, ECF Nos. 60, at 3-4, and 64, at 20. This excuse was equally unfounded. The governing FRA regulations do not require an NRR as a prerequisite to evaluating and using hearing protectors. Third, Union Pacific prohibits custom earplugs because it claims that "the quality of the custom mold can be highly variable," and that "without a noise reduction rating Union Pacific cannot determine the level of protection, which it considers a safety hazard for employees." *Mlsna*, 3:18-cv-00037, ECF No. 60, at 3-4. This is false as well: custom in-ear earplugs are actually more reliable on average than over-the-ear devices.

156.   Without these arbitrary restrictions, there are in fact many kinds of hearing protectors available on the market that allow hearing-impaired employees to perform their jobs.

157.   No one at Union Pacific took any additional steps to explore possible reasonable accommodations for Grigg.

**K.**   **Grigg's Experience Was Part of a Broad Pattern of Discrimination by Union Pacific Against Disabled Employees.**

158.   Union Pacific's discriminatory policies and refusal to accommodate employees are part of a larger campaign by Union Pacific to rid itself of employees with disabilities.

159.   Union Pacific's workforce is unionized, meaning it cannot reduce its workforce without furloughing its newest workers, many of whom Union Pacific's managers know will then seek employment elsewhere. By getting rid of its employees with disabilities, Union Pacific is able reduce its workforce without furloughing its newest— and often lowest-paid—employees.

160.   Employees with disabilities—like Grigg—are likely to have higher associated medical costs. Union Pacific is self-insured. By eliminating employees with disabilities, Union Pacific reduces the amount it must pay for employees' medical expenses.

**L.**   **Grigg Exhausted His Administrative Remedies.**

161.   On November 20, 2018, Grigg filed a charge with the Equal Employment Opportunity Commission.

162.   The Equal Employment Opportunity Commission issued a "Right to Sue" letter on March 25, 2021.

163.   Grigg's case is not the only one challenging Union Pacific's unlawful hearing-protection and hearing-exam policies—far from it. Another case, *Harris v. Union Pacific*, 8:16-cv-00381 (D. Neb.), broadly challenged Union Pacific's policies of sidelining

disabled employees through fitness-for-duty evaluations. This Court certified a class of all employees who have been or will be subject to a fitness-for-duty evaluation because of a reportable health event from September 18, 2014, until the end of that case. Grigg was a class member in *Harris*. On March 24, 2020, the Eighth Circuit ordered the class decertified. *Harris v. Union Pacific Railroad Co.*, 953 F.3d 1030, 1032 (8th Cir. 2020). The Eighth Circuit held, essentially, that the class was too broad in scope to meet Rule 23's predominance requirement. *Harris* covered over 650 separate jobs and encompassed all Union Pacific employees subjected to fitness-for-duty evaluations, covering all manner of possible disabilities. But *Harris* acknowledged that a more narrowly targeted class involving a specific type of disability and narrower group of positions—like the class Grigg seeks to represent here—could be appropriate for class certification.

164.    This case follows on the heels of the *Mlsna* case as well. *See* 3:18-cv-00037 (W.D. Wis.). Mlsna filed his EEOC charge on April 29, 2015 and challenged the same employment practice that Grigg does here. Mlsna, however, chose to litigate his claim on an individual basis. The trial in *Mlsna* is set for June 28, 2021.

165.    Another former Union Pacific employee, Charles Waldschmidt, filed his EEOC charge on October 21, 2019 and challenged the same employment practice that Grigg does here. Through undersigned counsel, Waldschmidt filed a claim in the District of Colorado.

## CLASS ACTION ALLEGATIONS

166.    Grigg brings ADA claims pursuant to Federal Rule of Civil Procedure 23, seeking back pay, front pay, monetary relief, other compensatory relief, and injunctive and declaratory relief on behalf of himself and the following class:

> Individuals who took and passed the FRA's hearing acuity test with or without hearing aids and who nevertheless were the subjects of one or more adverse actions by Union Pacific because of their hearing acuity test results at any point between the commencement of Union Pacific's hearing-protection and hearing-acuity policies and the resolution of this action.

167.    Class treatment is appropriate because the class is so numerous that joinder of all members is impracticable. The exact number within the class is unknown but may be determined from records maintained by Union Pacific.

168.    Class treatment is appropriate because there are questions of law or fact common to the class, including but not limited to:

    a.    Whether Union Pacific discriminated against Class Members on the basis of their disabilities;

    b.    Whether Union Pacific has a uniform policy of requiring hearing-impaired employees to pass the FRA's hearing acuity test while wearing hearing protection, and whether that policy discriminates against hearing-impaired employees;

    c.    Whether wearing hearing protection is an essential function of the job;

    d.    Whether Union Pacific's policy of requiring hearing-impaired employees to pass the FRA's hearing acuity test while wearing hearing protection is an essential function of the job;

44

e.   Whether Union Pacific's policy of requiring that all hearing-impaired employees use a single company-approved device amounts to discrimination on the basis of disability;

f.   Whether Union Pacific's hearing-protection and hearing-exam policies have the effect of "limiting, segregating, or classifying a[n]… employee in a way that adversely affects the opportunities or status of such…employee because of the disability of such…employee"; "utilizing standards…that have the effect of discrimination on the basis of disability"; or "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities." 42 U.S.C. § 12112(b)(1), (3), (6).

g.   Whether Union Pacific failed to accommodate employees' disabilities by enforcing its hearing-protection and hearing-testing rules;

h.   Whether monetary damages, injunctive relief, and other equitable remedies for the class are warranted; and,

i.   Whether punitive damages are warranted.

169.   Union Pacific is expected to raise additional common defenses to the claims.

170.   Class treatment is appropriate because the named Plaintiff's claims are typical of the claims of the class, and the named Plaintiff will fairly and adequately protect the interests of the class.

171.    The named Plaintiff has retained competent counsel who are experienced in litigating class actions and will effectively represent the interests of the class.

172.    Class treatment is appropriate under Federal Rule of Civil Procedure 23(b)(1) because prosecuting separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Union Pacific, and/or would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

173.    Class treatment is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Union Pacific has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

174.    Class treatment is appropriate under Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact, including those listed above, predominate over any questions affecting only individual members, and because a class action is superior to other available methods for the fair and efficient adjudication of this controversy.

175.    Finally, class treatment is appropriate under Federal Rule of Civil Procedure 23(c)(4) because this is a case in which class adjudication of particular issues would serve the interests of the parties and the Court.

## CAUSES OF ACTION

### COUNT I
### DISPARATE TREATMENT
### VIOLATIONS OF 42 U.S.C. §§ 12112(B)(1), (B)(3), AND (B)(6), AND OF 42 U.S.C. § 12101, *et seq.* (Brought on Behalf of the Class Defined Above)

176.    Grigg hereby incorporates paragraphs 1-175 above.

177.    The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." *Id.* § 12112(a). A "qualified individual" is someone "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position." *Id.* § 12111(8).

178.    The phrase "discriminate against a qualified individual on the basis of disability" embraces both plain and technical meanings. At the most basic level, an employer discriminates when it takes an "adverse employment action because of [an employee's] disability." *Furnish*, 270 F.3d at 448. But the ADA also specifically defines "discriminate against a qualified individual on the basis of disability" to include: "limiting, segregating, or classifying a[n]… employee in a way that adversely affects the opportunities or status of such… employee because of the disability of such… employee"; "utilizing standards, criteria, or methods of administration… that have the effect of discrimination on the basis of disability"; or "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities." 42 U.S.C. § 12112(b)(1), (3), (6).

179.   Union Pacific was Grigg's employer within the ADA's meaning.

180.   Grigg is disabled within the ADA's meaning.

181.   Grigg is a qualified individual within the ADA's meaning.

182.   Union Pacific discriminated against Grigg on the basis of disability when it removed him from service and prohibited him from working on the basis of Grigg supposedly failing Union Pacific's hearing exam.

183.   Union Pacific's hearing-exam protocol discriminates against hearing-impaired employees, including Grigg, for a whole host of reasons.

184.   Union Pacific's policy openly disfavors hearing-impaired employees: only employees who wear hearing aids are required to meet the FRA's acuity test while wearing hearing protection. Employees who pass the test without hearing aids are not required to pass it while wearing hearing protection.

185.   Union Pacific's policy also "limit[s]" and "classif[ies]" hearing-impaired employees, including Grigg, "in a way that adversely affects the opportunities or status of such…employee because of the disability of such… employee," 42 U.S.C. § 12112(b)(1), "utilize[es] standards, criteria, or methods of administration… that have the effect of discrimination on the basis of disability," *id.* § 12112(b)(3), and "us[es] qualification standards, employment tests or other selection criteria that screen out… an individual with a disability or a class of individuals with disabilities," *id.* § 12112(b)(6). For these reasons, Union Pacific has violated the ADA in every instance where it has used its hearing-exam protocol to refuse to certify (or to decertify) any employee as a conductor or engineer, to

remove them from service, or to terminate any employee, including Grigg, who was able to pass the FRA's hearing exam with or without hearing aids.

186.    Union Pacific violated 42 U.S.C. § 12112 and 42 U.S.C. § 12101 *et seq.* As a result, Grigg has suffered and will continue to suffer loss of income, emotional distress. Grigg is also entitled to attorneys' fees and costs incurred in connection with these claims.

187.    Union Pacific committed the above-alleged facts with reckless disregard or deliberate disregard for Grigg's rights. As a result, Grigg is entitled to punitive damages.

**COUNT II**
**DISPARATE IMPACT**
**VIOLATIONS OF 42 U.S.C. §§ 12112(B)(3) AND (B)(6), AND OF 42 U.S.C.**
**§ 12101, *et seq.***

188.    Grigg hereby incorporates paragraphs 1-187 above.

189.    Union Pacific has a policy of refusing to certify or recertify, holding out of service, terminating, or otherwise taking adverse action against hearing-impaired train employees unless they can pass its hearing-acuity test without their hearing aids (and, while simultaneously wearing hearing protection). This policy goes far beyond what the FRA regulations require and has an obvious disparate impact on hard-of-hearing individuals. Every single adverse action Union Pacific has taken under the policy has been against a disabled individual with some form of hearing impairment. One hundred percent of the train crew personnel held out of service under the policy were disabled, hearing-impaired individuals.

190.    Union Pacific's policy "screen[s] out or tend[s] to screen out" hearing-impaired individuals and discriminates against hearing-impaired people broadly as a class.

Union Pacific "us[es] qualification standards, employment tests or other selection criteria that screen out or tend to screen out a class of individuals with disabilities," *id.* § 12112(b)(6), and also "utilize[es] standards, criteria, or methods of administration… that have the effect of discrimination on the basis of disability," *id.* § 12112(b)(3).

191.    For these reasons, Union Pacific's policy has a disparate impact on hearing-impaired people generally, and Union Pacific has violated the ADA in every instance where it has used its hearing-exam protocol to refuse to certify (or to decertify) as a conductor or engineer, to remove from service, or to terminate any employee, including Grigg, who was able to pass the FRA's hearing exam with or without hearing aids.

192.    Union Pacific violated 42 U.S.C. § 12112 and 42 U.S.C. § 12101 *et seq.* As a result, Grigg has suffered and will continue to suffer loss of income, emotional distress, and other damages. Grigg is also entitled to attorneys' fees and costs incurred in connection with these claims.

193.    Union Pacific committed the above-alleged facts with reckless disregard or deliberate disregard for Grigg's rights. As a result, Grigg is entitled to punitive damages.

### COUNT III
### FAILURE TO MAKE REASONABLE ACCOMMODATIONS
### VIOLATIONS OF 42 U.S.C. § 12112(b)(5) AND OF 42 U.S.C. § 12101 *et seq.*
### (Brought on Behalf of the Class Defined Above)

194.    Grigg hereby incorporates paragraphs 1-193 above.

195.    The ADA also defines discrimination to include "not making reasonable accommodations to the known physical… limitations of an otherwise qualified individual with a disability." *Id.* § 12112(b)(5)(A).

196.    When an employee asks for an accommodation because of a disability, the employer "must engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances." *Kauffman v. Peterson Health Care VII, LLC*, 769 F.3d 958, 963 (7th Cir. 2014). Though not an independent cause of action, an employer's failure to engage in the interactive process is actionable when it prevents the identification of an appropriate accommodation for a qualified individual. *Spurling v. C&M Fine Pack, Inc.*, 739 F.3d 1055, 1059 n.1 (7th Cir. 2014).

197.    Union Pacific failed to accommodate Grigg's disability. Any number of devices would have allowed Grigg to meet both the FRA's and Union Pacific's standards. Grigg repeatedly asked Union Pacific for help finding a solution that would allow him to return to his job. Union Pacific's bad faith caused the breakdown in the process and ultimately precluded the identification of a mutually agreeable accommodation.

198.    Union Pacific's strict policy mandating the use of a single-hearing protection device for all hearing-impaired train crew—and its policy of refusing to allow train employees to wear hearing aids under their ear protection—results in a failure to identify reasonable accommodations for all otherwise qualified hearing-impaired individuals who fail Union Pacific's stringent and discriminatory hearing test criteria.

199.    Union Pacific violated 42 U.S.C. § 12112 and 42 U.S.C. § 12101 *et seq.* As a result, Grigg has suffered and will continue to suffer loss of income, emotional distress, and other damages. Grigg is also entitled to attorneys' fees and costs incurred in connection with these claims.

200.   Union Pacific committed the above-alleged facts with reckless disregard or deliberate disregard for Grigg's rights. As a result, Grigg is entitled to punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief as follows:

A.   Grigg requests that the Court find and declare that Union Pacific acted in direct violation of the ADA and enjoin Union Pacific from engaging in future discrimination;

B.   Certify a class of similarly situated employees, appoint Grigg as the class representative, and appoint Grigg's attorneys as class counsel;

C.   Grigg further requests that the Court order Union Pacific to:

• reinstate him and other class members and enter an injunction prohibiting Union Pacific from enforcing its discriminatory policies;

• pay to him and other class members an award of compensatory damages, including backpay and front pay, arising from loss of income and benefits in an amount to be determined by the trier of fact;

• pay to him and other class members an award for emotional distress;

• pay to him and other class members an award for costs (including litigation and expert costs), disbursements, and attorneys' fees; and

• pay to him and other class members an award for $300,000 for punitive damages for each violation of the ADA.

D.   Grigg further requests that the Court order judgment against Union Pacific for all other relief available under the ADA and such other relief as the Court deems just and equitable.

## **JURY DEMAND**

Plaintiff demands a trial by jury of all issues triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED this 23nd day of June, 2021.

CHARLIE GRIGG, Plaintiff

By:     _/s/Corey L. Stull_____
Corey L. Stull, NSBA #21336
ATWOOD, HOLSTEN, BROWN,
DEAVER, SPIER & ISRAEL, P.C., L.L.O.
575 Fallbrook Blvd., Suite 206
Lincoln, NE 68521
Tel: (402) 476-4400
cstull@atwoodlawyers.com

Adam W. Hansen*
adam@apollo-law.com
Eleanor Frisch*
eleanor@apollo-law.com
Colin R. Reeves*
colin@apollo-law.com
APOLLO LAW LLC
333 Washington Avenue North
Suite 300
Minneapolis, MN 55401
Telephone: (612) 927-2969

Nicholas D. Thompson*
nthompson@moodyrrlaw.com
THE MOODY LAW FIRM, INC.
500 Crawford Street, Suite 200
Portsmouth, VA 23704
Telephone: (757) 393-4093

* Pro hac vice forthcoming

Attorneys for Plaintiff Charlie Grigg and
the Proposed Classes